**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2107**

CTB, INC.,

               Plaintiff - Appellant,

      v.

HOG SLAT, INC.,

               Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Louise W. Flanagan, District Judge. (7:14-cv-00157-FL)

Argued: January 29, 2020               Decided: March 27, 2020

Before KEENAN, WYNN, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Rushing joined.

**ARGUED:** Cynthia M. Filipovich, CLARK HILL PLC, Detroit, Michigan, for Appellant. Robert Charles Van Arnam, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Andrew R. Shores, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee.

WYNN, Circuit Judge:

In this trade dress infringement case, Plaintiff-Appellant CTB, Inc. ("Plaintiff") appeals rulings of the U.S. District Court for the Eastern District of North Carolina granting summary judgment in favor of Defendant-Appellee Hog Slat, Inc. ("Defendant") on the grounds that Plaintiff's trade dress registrations, which cover the shape and color scheme of its chicken feeder products, are functional and thus only eligible for patent law's protection of utilitarian inventions. Plaintiff also appeals a district court order recommending a trial sanction for spoliation of evidence. For the reasons set forth below, we conclude the district court did not err in granting summary judgment and that the sanction is moot. Accordingly, we affirm.

I.

A.

Plaintiff and Defendant manufacture, market, and sell pan feeders for chicken farms. Pan feeders, which have become the industry standard, are placed throughout poultry barns and generally consist of three portions: a bottom pan, from which chickens eat; a top grill, containing spokes that separate feeding birds; and a center cone, which may be adjusted to regulate the amount of feed distributed from a central feed line to the pan. Pan feeders permit efficient and plentiful feeding of broiler chickens[1] through their lifespans.

In 1990, Plaintiff obtained United States Patent No. 5,092,274, titled "Poultry Feeder" ("'274 Patent"). That patent claimed a novel structure for the spokes and pan that

---

[1] Broiler chickens are those raised for consumption, as opposed to "breeder" chickens, which are raised to lay eggs.

improved upon several issues observed with prior art pan feeders. As relevant to this appeal, the '274 Patent noted that "the shape and configuration" of the spokes in the top grill portion of prior art feeders could cause "birds which force their way into the feeder apparatus [to] become trapped inside," resulting in injury or death. '274 Patent col. 1 ll. 36-38. An example of one such prior art feeder is below.



U.S. Patent No. 3,230,933 fig. 5.

To solve this problem, the '274 Patent used L-shaped spokes to increase the area within the feeder, thus giving birds that enter the feeder more room to maneuver out. An image of such a feeder is shown below.



3

'274 Patent fig. 2.

Specifically, the '274 Patent disclosed spokes arranged in an "inverted L-shaped profile," *id.* at claims 3, 18, that "radially project outward [from the feeder center] at spaced intervals in a substantially horizontal direction, until turning downward to extend in a substantially vertical direction . . . ," *id.* at col. 5 ll. 9-12. Those spokes "define an annular area 50 within the feeder 10 of significantly greater dimension in both height and depth than existed in comparable prior art feeders," *id.* at col. 5 ll. 16-18, ensuring that "birds and animals that do find their way inside have sufficient room to maneuver past and get out of the grill means 36 easier than it was for them to get in, without suffering injury and/or damaging the feeder," *id.* at col. 5 ll. 27-31.

The '274 Patent also disclosed a more efficient shape for the feeding pan. The pan contains a raised "conical central bottom portion," creating a "V" shaped circular trough denoted by the arrows in the below image. *Id.* at col. 7 l. 29.



*Id.* at fig. 16. That trough makes feed accessible to chickens. It also minimizes feed waste by ensuring that chickens cannot easily rake feed out of the pan. The pan as a whole "contain[s] and present[s] feed" to the chickens. *Id.* at claim 1, col. 2 ll. 39-40.

4

The '274 Patent expired in 2010. Shortly after its expiration, Plaintiff sought trade dress protection for the octagonal profile shape of its feeders. The United States Patent and Trademark Office ("USPTO") rejected Plaintiff's initial application as functional and therefore only eligible for patent protection, rather than trade dress. The USPTO asked Plaintiff to provide supplemental items relevant to its trade dress inquiry, including advertising and promotional materials for the feeders, a written explanation of alternative designs, and a written explanation of any similar designs used by Plaintiff's competitors. Although the parties dispute whether all such materials were submitted, the USPTO eventually granted U.S. Trademark Registration Number 4,116,988 ("Configuration Trade Dress"), pictured below, which was published on the principal trademark register.



The description of the Configuration Trade Dress reads:

> The mark consists of a three-dimensional configuration of a unique mechanized poultry feeder which includes a pan structure and a grill structure. When viewed from any side, the perimeter of the feeder has a generally octagonal shape as it has two generally vertical sides, defined by portions of both the pan structure and the grill structure, two generally horizontal sides, one defined at the bottom of the pan structure and the other

defined at the top of the grill structure, and four generally diagonal sides which interconnect the vertical sides to the horizontal sides. Internal angles between the diagonal sides and the vertical sides are generally smaller than the internal angles between the diagonal sides and the horizontal sides.

Plaintiff also sought trade dress protection for the shape of the Configuration Trade Dress in combination with the color scheme used in Plaintiff's feeders: a red pan with gray spokes. The USPTO initially rejected this application, finding the shape functional. Plaintiff then dropped its shape claims and sought only protection for the red and gray color combination. The USPTO repeatedly rejected that combination as insufficiently distinctive to differentiate Plaintiff's feeders from competitor products. Plaintiff eventually amended its application to seek publication on the supplemental trademark register. The USPTO then granted U.S. Trademark Registration Number 4,290,371 ("Color Trade Dress"), pictured below with color annotations added. The Color Trade Dress was published on the supplemental register.



The description of the Color Trade Dress reads:

The mark consists of the colors red and gray as it appears on the surface of the poultry feeder. The color red is provided on the surfaces of the pan and the color gray is provided on the surfaces of the grill of the poultry feeder. The overall shape of the poultry feeder is no[t] claimed as a feature of the mark.

In 2003, Plaintiff also obtained United States Patent No. 6,571,732, titled "Reflective Particle Feeder" ("'732 Patent"). That patent noted that "it is desirable for agricultural animals to eat plentifully so that they may stay healthy for their ultimate purpose," but that some animals "are not capable of detecting where their food is being set out." '732 Patent col. 1 ll. 10-19. The '732 Patent stated that one way to attract animals to feeders is via color, and that "it is relatively well known within the agricultural industry that adult turkeys and chickens are attracted to the color red and, therefore, many adult turkey and chicken feeding trays are now colored red in order to entice the adult turkeys and chickens to move towards the red feeding tray" to eat. *Id.* at col. 1 ll. 26-32.

The '732 Patent, observing that animals are "drawn or attracted" to reflective objects, also disclosed "a plastic non-reflective feeder that is integrally formed with a plurality of reflective particles that attract the attention of the animals . . . enabling them to find and eat the food in the feeder." *Id.* at col. 3 ll. 45-46, col. 2 ll. 6-11. The '732 Patent further stated that such reflective particles "are preferably metallic flecks or flakes, such as titanium or aluminum." *Id.* at col. 3 ll. 49-50.

The parties do not dispute that in 2009, shortly before expiration of the '274 Patent, Defendant began efforts to copy Plaintiff's C2 Plus feeder. *See* J.A. 3734 (Defendant's

7

CEO stating in an email that he wished to "clone [the C2 Plus feeder] ASAP").[2] Defendant ultimately began selling feeders very similar to Plaintiff's. The image below shows Plaintiff's C2 Plus feeder on the right and Defendant's GrowerSelect feeder on the left.



In 2013, Defendant's national sales manager stated in an internal email, "As I always say when selling [the GrowerSelect] pan to our customers . . . . [, w]e copied it identically, the good and the bad." J.A. 2480.

B.

In 2014, Plaintiff filed suit, alleging that Defendant, by copying the C2 Plus and selling it as the GrowerSelect, committed trademark infringement of the Configuration Trade Dress and Color Trade Dress under the Lanham Act, as well as North Carolina common-law trademark infringement.[3] Defendant answered and counterclaimed, arguing

---

[2] Citations herein to "J.A." refer to the contents of the Joint Appendix filed by the parties in this appeal.

[3] Plaintiff also brought claims for: unfair competition under the Lanham Act; violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"); and North Carolina common-law unfair competition. These claims are not relevant to the present appeal.

the asserted items of trade dress were invalid due to Plaintiff's deliberate failure to provide relevant information during their prosecution at the USPTO. Defendant also raised various defenses including, as relevant to this appeal, that Plaintiff's trade dress is dictated by utilitarian considerations of product function and thus may not be asserted.

In 2015, Defendant moved for sanctions against Plaintiff for alleged spoliation of evidence. The motion was referred to a magistrate judge, who recommended that Plaintiff be sanctioned for failing to preserve certain competitor advertisements requested by the USPTO during the trade dress application process. The magistrate found that Plaintiff could reasonably have expected those advertisements to be relevant to litigation, given that in 2011 Plaintiff requested that the USPTO expedite its trade dress applications due to Defendant's alleged infringement. *See CTB, Inc. v. Hog Slat, Inc.*, No. 7:14-CV-157-D, 2016 WL 1244998, at *11-12 (E.D.N.C. Mar. 23, 2016). The magistrate likewise recommended that Plaintiff be sanctioned for failing to preserve market surveys it conducted in 2013 regarding the distinctiveness and secondary meaning of its trade dress. *See id.* at *13. In light of the "manifest relevance of this evidence and applicability of the duty to preserve," the magistrate found Plaintiff's conduct willful and recommended an adverse inference instruction against Plaintiff at trial. *Id.*

The parties ultimately cross-moved for summary judgment. The district court granted summary judgment for Defendant on the trademark infringement claims, finding both the octagonal profile of the Configuration Trade Dress and the red-and-gray coloring of the Color Trade Dress dictated by functional considerations of product design, and thus unassertible under federal or common law. *CTB, Inc. v. Hog Slat, Inc.*, No. 7:14-CV-157-

9

FL, 2018 WL 4035945, at *18 n.30, *19 (E.D.N.C. Aug. 22, 2018).[4] Plaintiff asks us to reverse the district court's grant of summary judgment in favor of Defendant.

II.

On appeal, Plaintiff argues that the district court improperly granted summary judgment on the trade dress infringement claims because there is a material dispute of fact as to the functionality of its trade dress based on configuration and color. We affirm the district court's grant of summary judgment.

In general, trade dress serves the same function as trademarks: promoting competition by protecting features that identify a product's manufacturer or source. *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)). Rather than consisting of a brand name or logo, trade dress is the "total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (quotations and citations omitted).

Because trade dress is intended to promote competition, it cannot extend to product features that are functional, and thus covered by patent law's time-limited monopoly on utilitarian inventions. As the Supreme Court has explained:

---

[4] The district court also rejected Plaintiff's common law and Lanham Act unfair competition claims, as well as Plaintiff's NCUDTPA claims, for absence of a dispute of material fact on causation. *CTB*, 2018 WL 4035945, at *19-20. Plaintiff does not appeal the district court's grant of summary judgment on those claims. On appeal, Plaintiff acknowledges that its North Carolina common-law trademark infringement claims rise and fall with its federal infringement claims.

10

The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164-65 (1995) (citations omitted); *see also TrafFix*, 532 U.S. at 29.

Accordingly, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. . . . As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Allowing competitors to copy will have salutary effects in many instances." *TrafFix*, 532 U.S. at 29 (citation omitted).

In light of these considerations, three factors must be met for a party to bring a claim for trade dress infringement: (1) the trade dress is primarily non-functional; (2) the trade dress is inherently distinctive or has acquired a secondary meaning to customers; and (3) the alleged infringement creates a likelihood of confusion among customers as to a product's source. *See Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 657 (4th Cir. 1996) (collecting cases). Only the first factor—functionality— is relevant to this appeal. "[P]roof of a design element's functionality is a complete defense in a trademark-infringement action." *McAirlaids*, 756 F.3d at 310.

11

Functionality has been subject to a "plethora of definitions." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:68 (5th ed. 2017). However, in *TrafFix*, the Supreme Court recognized two tests for functionality from its precedents. The test relevant to this appeal is the traditional, or *Inwood*, formulation: a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n.10 (1982))). Put simply, a feature is functional if "it is the reason the device works." *Id.* at 34.[5]

Four factors, labeled the *Morton-Norwich* factors due to the case from which they originate, assist our functionality inquiry. They are: (1) the existence of utility patents disclosing the utilitarian advantages of a design; (2) advertising focusing on the utilitarian advantages of a design; (3) the availability of functionally equivalent alternative designs which competitors may use; and (4) facts indicating that a design results in a comparatively simple or cheap method of manufacturing the product. *McAirlaids*, 756 F.3d at 313 (citing *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)).

---

[5] *TrafFix* also recognized the "competitive necessity" test for functionality: a functional feature is one "the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32 (quotations omitted) (alterations in original). This test applies to the question of whether granting protection to an aesthetic design feature "would significantly hinder competition." *Qualitex*, 514 U.S. at 170 (quotations omitted). "Where [a product] design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *TrafFix*, 532 U.S. at 33. Because we find that Plaintiff's asserted trade dress is functional under the *Inwood* formulation, and because the parties do not point to the aesthetic value of any design features, we do not reach the competitive necessity test.

12

The Supreme Court has warned against readily granting trade dress protection, stating that "product design almost invariably serves purposes other than source identification." *TrafFix*, 532 U.S. at 29 (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213 (2000)). And under the Lanham Act, product design elements are presumed functional until proven otherwise by the party seeking trade dress protection. 15 U.S.C. § 1125(a)(3). This burden may be overcome, for example, if the design element is "merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix*, 532 U.S. at 30.

However, if an item of trade dress is registered on the principal trademark register, that registration creates a rebuttable presumption that the trade dress is valid, and therefore non-functional. *See* 15 U.S.C. §§ 1057(b), 1115(a), 1125(a)(3); *see also McAirlaids*, 756 F.3d at 311-12. The burden then shifts to the party challenging the registered trade dress to produce evidence of functionality to a preponderance standard. *McAirlaids*, 756 F.3d at 311 (citing *Retail Servs., Inc. v. Freebies Pub.*, 364 F.3d 535, 542 (4th Cir. 2004)). If that party produces sufficient rebuttal evidence, the "presumption [that the trade dress is valid, and therefore non-functional] is neutralized and essentially drops from the case." *Id.* at 311 n.1 (quoting *Retail Servs.*, 364 F.3d at 543).

Functionality "is a question of fact that, like other factual questions, is generally put to a jury." *Id.* at 310. We review de novo a district court's grant or denial of a motion for summary judgment, construing all facts and reasonable inferences therefrom in favor of the nonmoving party. *See Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 445 (4th Cir. 2010).

13

We may only grant summary judgment where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *McAirlaids*, 756 F.3d at 310 (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).

However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Similarly, "[p]ermissible inferences must still be within the range of reasonable probability . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted) (alterations in original).

Finally, a party's "self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment." *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004); *see also Williams v. Genex Servs., LLC*, 809 F.3d 103, 110 (4th Cir. 2015) ("It is well-settled that a plaintiff may not avoid summary judgment by submitting contradictory evidence."); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (noting that "[a]lthough we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

14

We turn now to the issue of whether the district court properly granted summary judgment to Defendant—addressing first Plaintiff's Configuration Trade Dress and then Plaintiff's Color Trade Dress claims—on the basis that both are dictated by functional considerations, and thus may not be asserted.

A.

Regarding Plaintiff's Configuration Trade Dress claim, Plaintiff argues the "generally octagonal shape" of its feeder "serves absolutely no function – *i.e.*, it is purely arbitrary or incidental," and thus qualifies for trade dress protection. Appellant's Br. at 19-20. To determine whether the octagonal profile claimed by the Configuration Trade Dress is functional, we first consider whether the top half of that octagonal profile, which is formed by the feeder's spokes, is primarily dictated by functional considerations. We then perform the same analysis for the bottom half of the octagonal profile, which is formed by the pan. Finally, we consider the functionality of the overall profile resulting from the combination of the upper spoke and bottom pan sections.

As the Configuration Trade Dress is included on the principal trademark register, we presume it is non-functional and ask whether Defendant has provided sufficient evidence of its functionality to negate that presumption. *See* 15 U.S.C. §§ 1057(b), 1115(a); *McAirlaids*, 756 F.3d at 311 n.1.

1.

First, regarding the upper spoke section, we conclude that the L-shaped spokes of the grill design, which form the top half of the octagonal outline of the Configuration Trade

15

Dress as shown below, primarily serve the functional purpose of permitting birds that enter the pan to readily exit.



Spoke Profile            Configuration Trade Dress

Our analysis is decided by Defendant's presentation of substantial and uncontroverted evidence under the first two *Morton-Norwich* factors—Plaintiff's utility patent and advertisements—describing the functional benefits of the spoke shape. Although Plaintiff encourages us to consider alternative designs under the third *Morton-Norwich* factor, *TrafFix* precludes such consideration.[6]

Under the first *Morton-Norwich* factor—the existence of utility patents touting the functional advantages of a product design—Plaintiff's '274 Patent is explicit and unequivocal that the spoke profile is functional. Claim 3 of the patent recites a grill that "comprises a plurality of spaced, spoke members having an *inverted L-shaped profile* and T-shaped cross-section thereby defining a rectangular area within the assembly and *making it easier for birds and animals to climb out of the feeder than to climb in*." '274 Patent claim 3 (emphasis added); *see also id.* at claims 14, 18. The '274 Patent's specification likewise teaches the functional advantages of the L-shaped spokes, noting that prior art

---

[6] The parties did not present any arguments regarding the fourth *Morton-Norwich* factor—whether the design results in a comparatively simple or cheap method of manufacture.

feeders did not create a sufficiently large volume for poultry to maneuver out of the pan if they entered it, but that the larger internal volume created by the angled spokes solved that problem. *See id.* at col. 5 ll. 13-31, col. 2 ll. 57-61. Similarly, Plaintiff's corporate designee on product functionality, John Cole, who is also a named inventor on the '274 Patent and Plaintiff's lead feeder designer, testified that the spoke profile facilitates the exit of poultry that enter the pan and constitutes an "essential benefit" of the feeder design. J.A. 1075.

Under the second *Morton-Norwich* factor—advertising focusing on the utilitarian advantages of a product's design—Plaintiff's marketing materials tout its feeders' "[c]hick-friendly 14-spoke grill design [that] lets birds exit pans easily." J.A. 186.

In light of the above uncontroverted evidence offered by Defendant, Plaintiff does not dispute that functional considerations influence the spoke section profile. Instead, Plaintiff, relying on the Supreme Court's opinion in *TrafFix*, argues that the *flattened* profile of the upper spoke section is an arbitrary and incidental element not claimed in the '274 Patent or its advertising materials. Plaintiff's argument misreads *TrafFix*.

In that case, the plaintiff held a patent on a design for road signs mounted on a pair of springs. 532 U.S. at 25. Those springs helped the sign stay upright in windy conditions. *Id.* Following the patent's expiration, the defendant cloned the sign, and the plaintiff sought to assert its trade dress on the same design. *Id.* at 25-26.

The Supreme Court in *TrafFix* relied entirely on the patent to find the trade dress functional. The Court found the trade dress sought to protect the "central advance" of the patent—the dual-spring design—and held that a prior patent "has vital significance in resolving the trade dress claim," constituting "strong evidence that the features therein

17

claimed are functional." *Id.* at 29. The Court then noted that had the plaintiff sought trade dress "to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain." *Id.* at 34.

Plaintiff relies on that language, arguing that the '274 Patent, while claiming angled spokes, does not specifically claim a flattened octagonal shape. Thus, Plaintiff reasons, the flattened octagonal profile of the Configuration Trade Dress is an "arbitrary or incidental" feature of the spoke profile. Appellant's Br. at 19-20.

But the '274 Patent discloses a more general spoke configuration, consisting of L-shaped spokes that "radially project outward [from the feeder center] at spaced intervals in a substantially horizontal direction, until turning downward to extend in a substantially vertical direction . . . ." '274 Patent col. 5 ll. 9-12. The uncontroverted evidence shows that configuration permits chickens to more easily exit the feeder. *Id.* at claims 3, 14, 18, col. 5 ll. 27-31. Thus, the profile created by Plaintiff's L-shaped spokes, whether a flattened octagon, a square, a rectangle, or another shape, is still dictated by a key functional consideration: creating a greater volume within the spokes to allow chickens that enter the pan to readily exit. As such, the L-shaped spoke design, regardless of specific configuration, "is not an *arbitrary* flourish in the configuration of [Plaintiff's] product; it is the reason the device works." *TrafFix*, 532 U.S. at 34 (emphasis added).

Indeed, *TrafFix* rejected a similar argument to the one Plaintiff makes here. There, the plaintiff's traffic-sign trade dress placed the two springs close together at the center of the sign, while the patent placed the springs at opposite corners of the sign. *Id.* at 30. The

18

Supreme Court held that difference of no moment, because "[t]he point is that the springs are necessary to the operation of the device." *Id.* So too is the angled, L-shaped spoke profile of the Configuration Trade Dress.

Plaintiff also relies on this Court's decision in *McAirlaids* to claim that the spoke profile is arbitrary. There, the plaintiff patented a process for joining sheets of cellulose fiber by passing them through steel rollers printed with a raised pattern. 756 F.3d at 309. That raised pattern created a series of high-pressure dots at which the sheets were fused. *Id.* The patents at issue did not claim a specific pattern but specified general dot size and spacing parameters to ensure the sheets remained joined. *Id.* The plaintiff obtained trade dress protection for a certain pixel pattern of dots on the finished material. *Id.*

On appeal to this Court, we distinguished *TrafFix*. We noted that the utility patents in *TrafFix* protected the dual-spring mechanism, which was the same feature for which the *TrafFix* plaintiff sought trade dress protection. *Id.* at 312. In contrast, the *McAirlaids* plaintiff's patents covered a process and a material, while the trade dress covered a certain pattern on the material resulting from the process. *Id.* Because the pattern was not a "central advance" of any utility patent, we concluded that the patents did not establish that the "feature in question is shown as a useful part of the invention." *Id.* at 312 (quoting *TrafFix*, 532 U.S. at 34). Rather, we noted that:

> Neither of [the plaintiff's] patents refer to a particular embossing pattern. Both patents reference line-shaped as well as point- or dot-shaped pressure areas, but the patents also directly acknowledge that embossing studs of different shapes can be used, including lines, pyramids, cubes, truncated cones, cylinders, and parallelepipeds. In fact, the diagrams of the [patents] show hexagonal shapes rather than circles. Therefore, while [the plaintiff's]

19

patents do provide evidence of the dots' functionality, they are not the same "strong evidence" as the patents in *TrafFix*.

*Id.* at 312 (citations omitted). We also noted that, unlike in *TrafFix*, the *McAirlaids* defendant bore the burden of proving functionality because the asserted trade dress was published on the principal trademark register. *Id.* at 311. We went on to find that disputed facts prevented the defendant from meeting its burden and precluded summary judgment. *Id.* at 314. In particular, we found that because the plaintiff's patents did not claim the particular pattern of the trade dress, and because the plaintiff's engineers and officers claimed to have selected that pattern from multiple alternatives because "it looked nice," summary judgment would have required us to improperly "weigh[] evidence and mak[e] credibility determinations." *Id.* at 313-14.

Here, by contrast, Defendant has come forward with substantial and uncontroverted evidence, in the form of Plaintiff's utility patent, advertisements, and the testimony of its lead feeder designer, that the shape of the feeder's top half is a direct consequence of the '274 Patent's functional L-shaped spokes. Nor does the '274 Patent note any other spoke shapes and profiles, as did the patents in *McAirlaids*. In fact, despite Plaintiff's claim that the "squished octagonal shape" of the Configuration Trade Dress is "absent from the '274 patent," Appellant's Br. at 32, Plaintiff concedes that the profile of the feeder in the '274 Patent is "virtually identical" to that of the Configuration Trade Dress, as shown below. J.A. 3534.

20




'274 Patent                     Configuration Trade Dress

As such, Defendant has carried its burden to neutralize the presumption of nonfunctionality, which thus drops from the case. *McAirlaids*, 756 F.3d at 311 n.1. In its absence, Plaintiff has not presented any countervailing facts to send the functionality inquiry to the jury.

Put simply, this case is much closer to *TrafFix* than *McAirlaids*. The '274 Patent claims L-shaped spokes because that shape provides a functional benefit. Plaintiff sought trade dress protection on a shape that flows directly from that function. Its attempts to distinguish the particular shape of that trade dress fail because that shape is still dictated by the same undisputed functional considerations.

Turning to the third *Morton-Norwich* factor—the availability of functionally equivalent alternative designs which competitors may use—Plaintiff urges us to consider an alternative feeder disclosed in a competitor patent, in which the spokes consist of three angled sides, as evidence that the Configuration Trade Dress's octagonal profile is arbitrary and non-functional. Plaintiff also encourages us to consider various competitor feeders in the record.

Consideration of alternatives in this case is foreclosed by *TrafFix*. There, the Supreme Court declined to "engage . . . in speculation about other design possibilities [for the dual-spring traffic sign trade dress], such as using three or four springs which might

21

serve the same purpose," noting that "the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used. The dual-spring design is not an arbitrary flourish in the configuration of [the plaintiff's] product; it is the reason the device works. Other designs need not be attempted." *TrafFix*, 532 U.S. at 33-34; *see also Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 506 (6th Cir. 2013) ("The issue is not whether [the defendant] could have designed a grease pump with a different appearance; the issue is whether [the plaintiff's] design is essential to the use or purpose of the article or if it affects the cost or quality of the article." (quotations and citations omitted)); *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010) (finding the plaintiff's folding chair trade dress "functional not because it is the only way to do things, but because it represents one of many solutions to a problem" and that although multiple functional alternatives could be derived "along the axes of weight, strength, kind of material, ease of setup . . . [a] novel or distinctive selection of attributes on these many dimensions can be protected for a time by a utility patent or a design patent, but it *cannot be protected forever as one producer's trade dress*" (emphasis added)); *In re Bose Corp.*, 772 F.2d 866, 872 (Fed. Cir. 1985) ("That another type of [design] would work equally as well does not negate that this [design] was designed *functionally* to enhance or at least not detract from the rest of the system.").

The same reasoning applies here. Plaintiff's two-sided, L-shaped spokes serve the functional purpose of permitting chickens to exit the feeder easily. Whether or not a three-sided spoke, or some other alternative design, serves the same purpose does not render Plaintiff's engineering-driven L-shaped spoke design arbitrary or non-functional. Finding

22

otherwise would create the exact issue the Supreme Court has repeatedly cautioned against: overextending patent law's monopoly on useful product features through the instrument of trade dress. *See TrafFix*, 532 U.S. at 29; *Qualitex*, 514 U.S. at 164-65.

*TrafFix* notwithstanding, Plaintiff encourages us to consider alternative designs under our decision in *McAirlaids*. There, we noted that "*TrafFix* did *not* hold that 'the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.'" *McAirlaids*, 756 F.3d at 312 (quoting *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002)).

But *McAirlaids* must be read in context. In the sentences immediately preceding the statement on which Plaintiff relies, we noted that we could only consider alternative designs "[b]ecause the facts of this case are different from those presented to the Supreme Court in *TrafFix*, [thus] *TrafFix*'s holding about alternative designs is inapplicable here." *Id.* As described above, we found two such distinguishing facts: (1) that the *McAirlaids* trade dress was not the central feature of any utility patent, and thus that the associated patents could not constitute the type of "strong evidence" that decided the functionality issue in *TrafFix*; and (2) that the *McAirlaids* trade dress enjoyed a presumption of functionality due to its publication on the principal trademark register, which the plaintiff had not overcome. *Id.* at 311-12. It is in that context that we found *TrafFix*'s prohibition on the consideration of alternatives inapplicable. *Id.* at 312. In so holding, we relied on *Valu Engineering*, which arrived at the same conclusion. *See* 278 F.3d at 1276 ("[W]e conclude that the [*TrafFix*] Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of

23

alternative designs, because *the feature cannot be given trade dress protection merely because there are alternative designs available*." (emphasis added and footnote omitted)).

Here, as in *TrafFix*—and unlike in *McAirlaids*—the spoke shape is a central improvement claimed by the '274 Patent. *See* '274 Patent claims 3, 18. And Defendant has introduced substantial and uncontroverted evidence to overcome the presumption of non-functionality. As in *TrafFix*, the Court need not consider alternative designs. The spoke profile constituting the top half of the Configuration Trade Dress is primarily functional.

2.

We now consider Plaintiff's second claim: whether the bottom half of the Configuration Trade Dress's octagonal profile—formed by the feeder pan—is primarily dictated by functional considerations. We conclude that it is.

The parties did not dispute below that the pan is functional, and Plaintiff concedes on appeal that "the v-shape[d] pan of CTB's '274 Patent serves a utilitarian purpose of allowing the feed to remain accessible to the chicks . . . ." Reply Br. at 10. Instead, Plaintiff argues that the pan's profile is not dictated by the functional V shape of the pan bottom because the Configuration Trade Dress did not claim that shape. According to Plaintiff, if the V-shaped design was part of the claimed trade dress, the resulting feeder profile would have nine sides, as illustrated below.

24





| Configuration Trade Dress | Plaintiff's Hypothetical Nine-Sided Trade Dress |

Of course, the relevant question before us is whether the asserted trade dress is primarily dictated by functional considerations, not whether such trade dress displays every functional design element of a product. *See TrafFix*, 532 U.S. at 32-33. As shown below, the profile of the pan portion of the Configuration Trade Dress consists of two slanted side portions (1) constituting the outside edges of the circular V-shaped bottom ring, two generally vertical portions (2) that join with the upper spoke section, and a flat bottom section (3) that itself constitutes the bottom outer edge of the V-shaped ring viewed from the side. The record shows no dispute that each of these elements is generously influenced by engineering necessity.



First, the '274 Patent teaches that the pan serves the function of "containing and presenting feed" to chickens. '274 Patent claim 1, col. 2 ll. 39-40. Further, as Mr. Cole testified, the outer slanted edge of the V shape (1) serves the additional purpose of saving

feed by ensuring that feed slides back into the pan when chickens rake at it. Plaintiff's advertisements likewise tout "[f]eed saver features includ[ing] the deep, 'V'-shaped pan bottom," J.A. 1145, which "places feed where birds can easily reach it." J.A. 1148. Similarly, Mr. Cole testified that the vertical portion of the pan wall (2) discourages birds from bodily entering the feeder assembly while also not being so high that young chicks cannot access feed. Mr. Cole likewise testified that the rounded pan bottom (3) assists in containing and presenting feed and is essential to the feeder's operation. *See Specialized Seating*, 616 F.3d at 727 ("Sometimes the function of the functionality doctrine is to prevent firms from appropriating basic forms (such as the circle) that go into many designs."); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) ("While trademarking a generic term would create a monopoly in a necessary word or phrase, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

As such, we find no dispute that the bottom half of the Configuration Trade Dress—the pan profile—is functional.

3.

Our inquiry does not end there. As Plaintiff notes, "the critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress *as a whole* is functional." *Tools USA*, 87 F.3d at 658; *see also Two Pesos*, 505 U.S. at 764 n.1. We thus consider whether, even though the bottom pan and top spoke assemblies' profiles are functional, their combination results in assertible trade dress in the form of the feeder's overall flattened octagonal profile.

Plaintiff offers no reason why the combination of two wholly-functional components—the pan and the spoke assembly—gains some non-functional character that qualifies the entire feeder for trade dress protection. Instead, the '274 Patent teaches that the pan must be "positioned beneath" the spoke assembly for the two to interlock and function as intended. '274 Patent col. 7 l. 39. The overall feeder profile thus results from a simple and utility-driven amalgamation of its two functional halves. *See Leatherman Tool Grp., Inc., v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) ("[W]here the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional."); *see also Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 995 (Fed. Cir. 2015), *rev'd on separate grounds*, 137 S. Ct. 429 (2016); *Groeneveld*, 730 F.3d at 504-05. Thus, the total feeder profile is functional and ineligible for trade dress protection. For that reason, Plaintiff may not assert the Configuration Trade Dress.[7]

---

[7] Plaintiff also argues in passing that other utilitarian features of the '274 Patent, such as a locking gate mechanism, an interlock joining the grill and pan sections, and the spokes' T-shaped cross section, do not implicate the octagonal shape claimed by the Configuration Trade Dress. But the test is not whether a patent claims other functional elements unrelated to the trade dress at issue; the test is whether the claimed trade dress is dictated by functional considerations. *See TrafFix*, 532 U.S. at 32-33. Plaintiff's arguments regarding other utilitarian features of the patent are thus irrelevant.

B.

We now consider whether the red pan and gray spokes of the Color Trade Dress are dictated by functional considerations. Our review is again de novo. *McAirlaids*, 756 F.3d at 310.

Because the Color Trade Dress was placed on the supplemental trademark register, rather than the principal register, it is presumed functional, and Plaintiff bears the burden of proving non-functionality. *See* 15 U.S.C. § 1125(a)(3). Plaintiff cannot do so, because its own utility patents and witness testimony establish that the red pan and gray spokes serve the functional purpose of attracting chickens to feed.

1.

We begin with the red pan. Plaintiff's '732 Patent notes, "it is relatively well known within the agricultural industry that adult turkeys and chickens are attracted to the color red and, therefore, many adult turkey and chicken feeding trays are now colored red in order to entice the adult turkeys and chickens to move toward the red feeding tray . . . ." '732 Patent col 1 ll. 26-32; *see also id.* at col. 3 ll. 30-33 (noting that "chickens and adult turkeys are known to be attracted to the color red and, thus, the feeder 10 is preferably formed with a reddish color"). The '732 Patent specifically claims that feature. *See id.* at claims 3, 9, 14.

Similarly, Mr. Cole testified: "Red will attract birds" and "I use red because it's a good color and it attracts birds." J.A. 1045-46. Further, Mr. Cole tested what colors best attracted chickens to various feeders. He found that chickens best responded to a black grill

28

and gold pan, but that Plaintiff's red and gray elicited "very close to the same type [of] response from the birds." J.A. 1113.

Despite this evidence, Plaintiff claims a material factual dispute because its primary expert briefly opined that "chicken[s] [] [are] not particularly attracted to red and gray materials in their environment. Nor do I think these birds would be more incline[d] to eat from a red and gray feeder when compared to green, orange, yellow or white feeders." J.A. 3624. Plaintiff's rebuttal expert similarly opined that "[t]here is no evidence that gray is functional as placed on the spokes, or red is functional as placed on the pan." J.A. 3618.

However, "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011) (quoting *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010)); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). Nor should we give undue weight to evidence submitted for purposes of manufacturing a factual dispute. *See Genex*, 809 F.3d at 110; *see also Giant Food*, 370 F.3d at 433 ("[A] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.").

Here, Plaintiff's '732 Patent and its lead feeder designer stated that feeders are colored red to attract chickens. Plaintiff relies on statements to the contrary in its later-submitted expert reports to create a fact issue.

This Court has not specifically ruled on whether a party's declaration that contradicts statements in that party's earlier utility patent and by that party's lead product designer precludes summary judgment on the issue of trade dress functionality. But other

29

courts and the Trademark Trial and Appeal Board have readily found—applying the same reasoning as *Genex*, *Giant Food*, *Family Dollar*, and similar cases—that such a statement does not create a triable fact issue. *See* McCarthy, *supra* § 7:89.30 (collecting cases). As the Ninth Circuit noted in *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*:

> A trademark proponent cannot create an issue of material fact regarding a shape's functionality, and thus survive summary judgment, by contradicting an earlier assertion contained in an expired utility patent that the same shape is functional. "A kind of estoppel arises. That is, one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection."

158 F.3d 1002, 1008 (9th Cir. 1998) (quoting McCarthy, *supra* § 7:89.30).

The same reasoning applies here. Plaintiff asserts, in its '732 Patent, that red attracts chickens. It further specifies that color as a feature of its claimed invention. Its lead designer testified that the pan is colored red to attract chickens. Plaintiff cannot now pivot and claim red does not perform that function in order to assert its trade dress. As such, we find no genuine dispute of material fact that Plaintiff's feeder pan is colored red for the functional purpose of attracting chickens.

## 2.

We next consider whether the gray coloring of the spoke assembly is functional.

At the outset, although the Color Trade Dress claims "gray" spokes, the district court found no dispute that Plaintiff's feeders actually use a "shiny gray" coloring that includes metallic particles intended to attract chickens to the feeder. *CTB*, 2018 WL 4035945, at *13.

30

Plaintiff argued below that because the Color Trade Dress only refers to "gray" spokes, the question of whether the spoke coloring includes shiny or metallic elements capable of attracting chickens is immaterial to its claim. *See* J.A. 3554-55 (arguing that "metallic flecks or flakes of the '732 Patent form no part of the Asserted Trade Dress and are not material to any issue in this lawsuit"). The district court disagreed, noting that "plaintiff cannot assert a claim for trade dress infringement of the colors red and gray where neither plaintiff's [n]or defendant's feeders utilize the gray asserted by plaintiff but instead utilize a shiny gray." *CTB*, 2018 WL 4035945, at *14. The district court based this conclusion on "the settled proposition that '[t]rademark ownership is not acquired by federal or state registration. Ownership rights flow only from prior use[.]'" *Id.* (alterations in original) (quoting *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014) (citing McCarthy, *supra* § 16:18 (4th ed. 2001) (collecting cases))).

The district court is correct that trademark rights flow from prior use and that Plaintiff's claim of trade dress infringement must rest on the actual color configuration of its feeders in the market. *Flying Pigs*, 757 F.3d at 182. The Color Trade Dress specifies as much, noting that the protected product configuration "consists of the colors red and gray *as it appears on the surface of the poultry feeder*." U.S. Trademark Reg. No. 4,290,371 (emphasis added).

The question, then, is whether there is a genuine fact issue as to whether the spokes of Plaintiff's feeders include shiny elements that serve the functional purpose of attracting chickens, regardless of whether the spokes are labeled "gray" (Plaintiff's preferred label,

31

Appellant's Br. at 37), "shiny gray" (the district court's label, 2018 WL 4035945, at *14) or "silver with aluminum metal flake" (Defendant's preferred label, Response Br. at 38).

There is no dispute that the spoke coloring includes shiny metallic elements. Indeed, Mr. Cole stated that Plaintiff's feeder spokes are "silver with metal flake in it. . . . [w]e do have metal flake in ours to give us a little bit of shine." J.A. 1027. He also described the color of the feeder spokes as "silver with aluminum metal flake." J.A. 1095.

Nor do the parties dispute that chickens are attracted to shiny metallic objects. Plaintiff's expert stated that "poultry are attracted to shiny metallic items in their environment." J.A. 3624-25. Similarly, Defendant's expert opined that "birds including chickens have been attracted to shiny metal objects" and that feeder manufacturers "us[e] shiny gray or metallic color to further attract the chickens to poultry feeders . . . ." J.A. 1783. Further, Plaintiff's '732 Patent, titled "Reflective Particle Feeder," describes the central advance of the claimed invention as a feeder "provided with a plurality of reflective particles that are integral with the body of the feeder and which act to attract the poultry to the feeder, thus enhancing feeding behavior." '732 Patent col. 1 ll. 7-10. The '732 Patent also teaches that such reflective particles "are preferably metallic flecks or flakes." *Id.* at col. 3 l. 49.

Thus, Plaintiff does not dispute: (1) that it uses metal flakes in the spoke coloring; (2) the sworn testimony of its corporate designee that those flakes are added to give the spokes "a little bit of shine," J.A. 1027; (3) the testimony of its own expert that "poultry are attracted to shiny metallic items in their environment," J.A. 3624-25; (4) the teachings of its own '732 Patent that chickens are attracted to reflective particles, '732 Patent col. 1

32

ll. 7-10; or (5) that the key innovation of its '732 Patent is "a plastic non-reflective feeder that is integrally formed with a plurality of reflective particles that attract the attention of the animals . . . preferably metallic flecks or flakes," *id.* at col. 2 ll. 6-8, col. 3 l. 49, claims 1, 7, 12, 18.

Plaintiff instead argues that the district court improperly found that the "silver with metal flake" coloring renders the spokes shiny and thus capable of attracting chickens. According to Plaintiff, the district court should have inspected, or allowed a jury to inspect, a feeder to make that determination.

Although Plaintiff correctly notes that we must draw all justifiable inferences in its favor, Plaintiff does not point to any competing factual submission that shows the gray spokes are not shiny. Indeed, Plaintiff's responses to Defendant's summary judgment motion merely stated that the *trade dress registration* only covered the colors red and gray, not that its *feeders* did not contain any shiny elements capable of attracting poultry. Similarly, nowhere in its appellate briefs does Plaintiff state that the gray spokes do not contain shiny elements. Instead, Plaintiff again sidesteps the issue by pointing the Court to the Configuration Trade Dress's recitation of "gray" rather than "shiny gray" coloring. Plaintiff then reiterates that "a jury should be afforded the opportunity to decide" the question of whether the spokes are shiny. Reply Br. at 22.

But for an issue to reach the jury, there must be a genuine dispute of material fact. Plaintiff has made no such showing. Rather, the uncontroverted testimony of its corporate designee shows it uses reflective metal flakes in its feeder to create a shiny appearance, and its own patent states that the inclusion of metal flakes serves the functional purpose of

33

attracting chickens. And although Plaintiff makes much of the district court's or the jury's ability to inspect the feeder, the record shows that the district court did so, including and discussing Plaintiff's submitted photographs of the feeder in-line in its opinion. *See CTB*, 2018 WL 4035945, at *7.[8]

Neither party disputes that the inclusion of shiny metal flakes in the feeder spokes serves the functional purpose of attracting birds.[9] As such, the coloring of the spokes is functional. *See Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531 (Fed. Cir. 1994) (color black on boat engines was functional because it was compatible with a variety of boat colors and made objects appear smaller); *C5 Med. Werks, LLC v. Ceram Tec GmbH*, 249 F. Supp. 3d 1210, 1218-19, 1219 n.5 (D. Colo. 2017) (finding pink color of hip implant functional because pink resulted from addition of chromium, which increased the implant's hardness); *Baughman Tile Co., Inc. v. Plastic Tubing, Inc.*, 211 F. Supp. 2d 720, 724 (E.D.N.C. 2002) (finding yellow tubing functional because that color (1) was generally more visible and (2) reflected more light than other colors, ensuring the tubing retained its

---

[8] The record does not show that the district court had a physical feeder available for inspection on summary judgment. Although Plaintiff stated to this Court that sample feeders were used as *demonstrative* aids at the district court, it appears that no such feeder was admitted into evidence for use in resolving the parties' summary judgment motions. Regardless, as discussed above, the record shows that the district court considered the feeder's appearance from the evidence before it.

[9] Plaintiff also emphasizes that the '732 Patent only references visible metallic particles. From that observation, Plaintiff suggests that "nothing in the record" indicates whether the inclusion of the metal flakes in its feeders provides the same benefit as that claimed by the '732 Patent. Reply Br. at 26. Plaintiff's assertions are belied by: (1) Mr. Cole's testimony that the reason Plaintiff adds aluminum flakes to the spoke coloring is to give the spokes a "bit of shine," J.A. 1027, and (2) its admissions that chickens are attracted to shiny objects, '732 Patent col. 3 l. 45.

shape in hot conditions); *accord Qualitex*, 514 U.S. at 165 (stating that color in some instances provides a functional benefit).

Additionally, as with the red pan, Plaintiff relies on its expert's general statement that "I see no evidence that the gray colored plastic used in feeding equipment is attractive to poultry in a similar way as shiny metallic surfaces" to create a jury issue on the functionality of the spoke coloring. J.A. 3625. As the district court properly noted, the expert's opinion covers gray plastic, not Plaintiff's gray plastic with reflective metal flakes, and is thus irrelevant. *CTB*, 2018 WL 4035945, at *16. And even if the expert's statement were construed to encompass the addition of metal flakes, it does not create a fact issue for the same estoppel-based reasons set out above for the pan's red coloring: the statement directly contradicts the central teaching of Plaintiff's own '732 Patent and the testimony of its lead product designer. *See Disc Golf Ass'n*, 158 F.3d at 1008; *see also Family Dollar*, 637 F.3d at 512; *Genex*, 809 F.3d at 110; *Harris*, 499 F. App'x at 294.

Accordingly, we conclude that there is no material factual dispute that the spoke coloring of the Color Trade Dress is primarily functional.

3.

Finally, we consider whether the combination of red and gray coloring provides an arbitrary, non-functional, or ornamental element not present in the individual halves of the feeder color scheme. *Tools USA*, 87 F.3d at 658. As with the Configuration Trade Dress, Plaintiff does not provide any evidence that the Color Trade Dress is anything more than the amalgamation of two wholly functional colored design elements. Plaintiff's arguments on this point instead reiterate its contentions that its expert testimony should be used to

35

create a fact issue, which fail for the reasons set forth above with respect to each color element.[10] We thus find no factual dispute that the combination of the red pan and gray spokes is primarily functional, and that Plaintiff may not assert the Color Trade Dress.

III.

In conclusion, we affirm the district court's grant of summary judgment to Defendant on Plaintiff's claims of trade dress infringement under the Lanham Act and North Carolina common law. Because summary judgment was properly granted, Plaintiff's appeal of the spoliation sanction against it is moot. *See SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 508 F. App'x 243, 255-56 (4th Cir. 2013).

*AFFIRMED*

---

[10] Plaintiff's reliance on *Transport Inc. v. Mayflower Services Inc.*, 769 F.2d 952, 955 (4th Cir. 1985), is also inapposite, as the functionality of a color combination was not at issue in that case.